| | | |
|---|---|---|
| Cynthia Haymon, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 848 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Metra, Art Olsen, Michelle LaCour, | ) | |
| Donna Salgado, Monserrat Perez, John | ) | |
| Meyer, Tracy Wynn, and Travis Boone, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Cynthia Haymon brings this *pro se* employment-discrimination lawsuit against Metra (formally known by its municipal-corporate name, the Northeast Illinois Regional Commuter Railroad Corporation),[1] as well as several current Metra employees: Art Olsen, Michelle LaCour, Donna Salgado, Monserrat Perez, John Meyer, and Tracy Wynn.[2][3] *See* R. 40, Am. Compl. at 1.[4] Although the precise contours of Haymon's claims are unclear, based on the *pro se* form she filled out as part of her complaint, Haymon appears to be bringing several discrimination claims: an age-

---

[1] Haymon's current employment status at Metra is not clear; she alleges that she has been "off work" for medical reasons since 2016, but does not say whether her employment has been formally terminated. *See* R. 40, Am. Compl. at 11. For purposes of this Opinion, the Court will assume that Haymon is still a Metra employee.

[2] Haymon also sued ex-Metra employee Travis Boone. But Boone has not yet filed an appearance in this case and is in default. More to the point, Haymon's claims against Boone are not directly at issue in this Opinion. So references to the "Defendants" do not include Boone.

[3] The Court has federal-question jurisdiction over this case under 28 U.S.C. § 1331.

[4] Citations to the record are noted as "R." followed by the docket number. Page citations to R. 40 (the Amended Complaint and its exhibits), R. 64-1 (Haymon's sur-reply and exhibits), and R.64-2 (second set of exhibits to Haymon's sur-reply) are to the PDF pagination because there is no internal numbering scheme for the filings.

discrimination claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et. seq.*; a disability-discrimination claim under either the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, or the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* (or both); a race-discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and under 42 U.S.C. § 1981; and religious- and sex-discrimination claims under Title VII. *See* Am. Compl. at 1. Haymon also brings discrimination claims under 42 U.S.C. § 1983, presumably invoking the Equal Protection Clause.

The Defendants have filed a motion to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). R. 45. For the reasons discussed below, the motion is granted in part and denied in part.

## I. Background

First, it is worth noting that Haymon's factual allegations in her Amended Complaint and supporting briefs are generally disjointed and somewhat hard to understand. Nevertheless, as far as it is possible to discern from the various submissions what Haymon is alleging, the Court accepts the allegations as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). *See also Thompson v. Ill. Dep't of Prof. Reg.*, 300 F.3d 750, 753 (7th Cir. 2002) (on a Rule 12(b)(6) motion, the pleadings "consist generally of the complaint, any exhibits attached thereto, and supporting briefs.") (citing Fed. R. Civ. P. 10(c)). And because Haymon is *pro se*, the Amended

Complaint will be expansively construed and held to a less stringent pleading standard. *Erickson*, 551 U.S. at 94.

Haymon, an African-American woman, first started working at Metra in May 2013, when she was 45 years old. Am. Compl. at 7. As a Metra employee, Haymon was a member of the Transportation Communications International Union and her position was subject to a collective bargaining agreement. *See, e.g.*, R. 64-1, Pl.'s Sur-reply Exhs. No. 1 at 276; R. 64-2, Pl.'s Sur-reply Exhs. No. 2 at 134. This matters because Haymon changed job positions several times while at Metra by exercising her "bumping" privileges as a Union employee—that is, if they are qualified for the job, a Union employee with more seniority is allowed to replace someone more junior by "bumping" into their position. *See, e.g.*, Am. Compl. at 7-11.

In any event, in November or December 2014, Haymon was working at Union Station as Assistant Lead Clerk when one of the clerks "disqualified" from their position; under the apparently intricate Union classification system, this meant that each employee there no longer had enough seniority for their current position. Am. Compl. at 7. As a result, Haymon had to revert back to her previous position of Mechanical Department Chief Clerk at the Western Avenue location. *Id.* In a dominos effect, that meant she bumped the then-Chief Clerk there, Travis Boone. *Id.* According to Haymon, this was when the discrimination against her began. *Id.*

For one, she was the oldest clerk at the Mechanical Department at the time. Am. Compl. at 8. And not only did Boone dislike reverting to his previous position, but he was also required to train Haymon for the Chief Clerk job. *Id.* at 7. At one

point, Haymon alleges, Boone stood in front of her forcefully, pointed his fingers in her face, and told her that she was too old for the job and that the position required someone younger and faster. *Id.* at 8.

Haymon reported Boone's behavior to Art Olsen, the acting Director of the Mechanical Department at the time, telling him that she was scared because Boone was much larger than her. Am. Compl. at 8. Haymon also contacted her Union representative, as well as the Equal Employment Opportunity Commission (or EEOC for short). But it does not appear that anyone did anything to help her. *See id.* According to Haymon, because she made these complaints, she was unjustly disqualified from the position of Chief Clerk in March 2015, and forced to revert back to General Clerk. *Id.*

When this happened, Boone apparently reverted himself back into the position of Chief Clerk without posting the opening—which would have allowed others to bid on it, as was the policy—so Haymon again reported him to the Union. Am. Compl. at 8. When Boone found out, he started insulting Haymon and threatening her that she would "pay for what [she] did." *Id.* He and another employee, Donna Salgado, allegedly began to give Haymon extra work to do, including work that only the Chief Clerk (a role she no longer held) was supposed to do. *Id.* What's more, Haymon alleges that Boone's anger and threats made her depressed and afraid to come to work on many days. *Id.* In fact, one day in April 2015, Salgado—with three other unknown individuals in her car—apparently chased Haymon on the expressway, which Haymon describes as a "terrifying situation." *Id.* at 8-9. Haymon also alleges that

when Boone was fired from his job as a Metra Ticket Agent, he blamed her for the termination, threatened to beat her up, and followed her around her neighborhood. *Id.* at 9.

Aside from the harassment that Haymon allegedly experienced at the hands of Boone and Salgado, Haymon also alleges that she was unfairly disciplined compared to other employees in the Mechanical Department. Am. Compl. at 9; *see also id.* ("One morning I asked Art Olsen why he is so hard on me and not the other clerks."). For example, Haymon mentions that she was disciplined after her supervisors "found papers on the copy machine that belonged to [her]." *See id. See also* R. 53, Pl.'s Resp. Br. at 10. Specifically, in February 2016, Metra suspended Haymon for 10 days for allegedly "download[ing] and print[ing] non-Metra work related material pertaining to an on-line course that [she was] enrolled in" from her Metra-assigned computer. Pl.'s Sur-reply Exhs. No. 1 at 90, 104-105. Although Haymon does not deny this, she alleges that other employees were not disciplined *at all* for more serious infractions, such as using headphones to listen to music (which is apparently not permitted for safety issues). Am. Compl. at 9.

Moreover, the unfair discipline Haymon mentions in her Amended Complaint appears to also include yet another suspension in February 2016, which Haymon describes in her sur-reply. *See* R. 64-1, Pl.'s Sur-reply Br. at 10. Specifically, Haymon alleges that she was disciplined for "being off work sick" in December 2015, even though she was out on a medical leave of absence that had been approved by Human Resources. *Id.* She also contends, more generally, that even though other clerks at

the Mechanical Department were not written up for "glaring errors" they made, she was disciplined for typographical errors and singled out. *Id.*; *see also* Am. Compl. at 11.

Due to the stress of working in the Mechanical Department, Haymon bid on and was awarded a position on the Electric Line, where she worked from February 2016 to June 2016. Am. Compl. at 9. Then, when she was bumped by a more senior clerk, Haymon decided to go to the Engineering Department, specifically choosing not to return to Mechanical "because of all the problems that [she] had there." *Id.* But Donna Salgado's cousin, Montserrat Perez, also worked in the Engineering Department (and seemed to hold a supervisory position). *Id.* at 9-10. According to Haymon, Salgado hated her and wanted to "make [her] pay for Boone's displacement and eventual termination. *Id.* at 10. On this basis, Haymon alleges (without elaborating) that "the trouble started" again. *Id.*

In addition to the "trouble" from Perez and Salgado, Haymon also alleges that she was unfairly disqualified from the General Clerk position at the Engineering Department. *See* Am. Compl. at 10. When Haymon first arrived there, Tracy Carpenter—the person Haymon bumped and who was supposed to train her—was off work for a week, so Haymon had to do the job without training. *Id.* When Carpenter returned, "she began to scream and holler at [Haymon] in front of other employees[,]" saying that Haymon was not qualified to be General Clerk. *See id.* To refute this, Haymon met with Perez and John Meyer, the Director of the Engineering Department, and told them she knew the responsibilities of the position because she

had been doing it by herself for a week. *Id.* Despite this, Haymon alleges that Meyer, Perez, and Carpenter made her take a test the next morning. *Id.* When Haymon failed it, they disqualified her from the position of General Clerk in the Engineering Department. *Id.* But according to Haymon, no other clerk—including General Clerks in other departments, such as Michelle LaCour and Donna Salgado—had ever been required to take a test like that to be awarded a position. *Id.* So Haymon requested an unjust-treatment hearing (apparently through a Union grievance). *Id.*

In the meantime, in August 2016, Haymon bumped back into the Mechanical Department as General Clerk, because "Art Olsen was no longer there, and [she] felt that [she would be treated with respect[.]" Am. Compl. at 10. According to Haymon, Shon George—the new Director of the Mechanical Department—actually told all the clerks in a September 2016 meeting that what happened to Haymon should have never taken place and that no one would be unjustly disqualified for a position again. *Id.* at 10-11. Despite this, Haymon alleges that "Salgado tried to make thing[s] difficult again." *Id.* at 10. First, Salgado apparently tried to give Haymon inaccurate information about the required work hours for the position. *Id.* Then in October 2016, on a day when Haymon was wearing an orange sweater and sporting an Afrocentric hairdo, she overheard Salgado describing her as "a nappy head pumpkin." *Id.* at 11.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the

defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

### A. Timeliness under Title VII and Section 1983

The defense first argues that both the Title VII claims and the Section 1983 claims are time-barred (at least to an extent). As a threshold matter, it is worth acknowledging that "[d]ismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative

---

[5]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

defenses, such as statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (cleaned up). Nevertheless, when the allegations of the complaint itself reveal that the case is untimely, dismissal is appropriate. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012). The right way to think about a dismissal for untimeliness based solely on the complaint is that it is essentially a judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *Brooks*, 578 F.3d at 579).

### 1. Title VII (Timeliness)

Starting with the Title VII claims, it is well-established that filing a charge with the EEOC is a necessary precondition to filing civil claims under Title VII. *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cty.*, 804 F.3d 826, 831 (7th Cir. 2015). The EEOC charge must be filed within 300 days of the unlawful employment practice (or if the plaintiff filed a charge first with a state or local agency, within 30 days of the agency's decision—but this is not applicable here). *See* 42 U.S.C. § 2000e-5(e)(1). Because Haymon filed her charge with the EEOC (and filed a joint charge with the Illinois Department of Human Rights) on September 20, 2016, the Defendants argue that liability on the Title VII claims can only be premised on conduct that occurred in the previous 300 days—in other words, anything before November 7, 2015 is time-barred. R. 45, Defs.' Br. at 4. The defense is correct.

In her response brief, Haymon seems to concede this point, explaining that her Amended Complaint only "goes as far back as 2014 because … [she] is giving

background" information about the discrimination and retaliation she suffered at Metra. Pl.'s Resp. Br. at 5. To be clear, Haymon is right: even if she cannot recover *damages* under Title VII for misconduct occurring before November 7, 2015, she can still use that evidence to support the Title VII claims that *are* timely. Despite this concession, though, Haymon later argues that she *can* recover for conduct going back to April 2015. R. 64, Pl.'s Mot. for Sur-reply at 5. But for purposes of her *Title VII claims*—should they survive—Haymon may only seek to recover for misconduct occurring after November 7, 2015. And the same goes for Haymon's claims under the ADA, the Rehabilitation Act, and the ADEA, which have the same timing requirements as Title VII with regard to filing an EEOC charge. *See, e.g.*, *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (Rehabilitation Act); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) (ADA and ADEA).

## 2. Section 1983 (Timeliness)

Similarly, the Defendants argue that the statute of limitations narrows down the Section 1983 claims. Defs.' Br. at 5. As a general matter, Section 1983 provides a procedural vehicle for lawsuits vindicating federal constitutional or statutory rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1994). Section 1983 claims are subject to "the statute of limitations for personal-injury claims in the state where the plaintiff's injury occurred." *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016) (cleaned up). In Illinois, the statute of limitations for personal-injury actions is two years. 735 ILCS 5/13-202; *see also Woods v. Ill. Dep't. of Children and Family Servs.,* 710 F.3d

762, 768 (7th Cir. 2013) ("[T]he limitations period applicable to *all* § 1983 claims brought in Illinois is two years[.]").

Here, the defense contends that the Section 1983 claims are barred as to conduct occurring before February 1, 2016, which is exactly two years before Haymon filed this lawsuit. Defs.' Br. at 5-6; R. 1. But this is not the right calculation. The limitations clock starts ticking when the *claim accrues*. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). Section 1983 discrimination claims accrue "when the plaintiff knows or should know that his or her constitutional rights have been violated[.]" *Id.* (cleaned up). So the statute of limitations is not necessarily calculated by counting backwards from the date the complaint was filed.[6]

That said, in this case, the Section 1983 claims are *completely* barred. Specifically, Haymon complained to Metra's Equal Employment Opportunity department of unlawful discrimination based on her race, sex, age, and disability way back in *2014. See* R. 45-1, Defs.' Br., Exh. 1, Pl.'s EEOC Charge at 2. *See also, e.g.*, *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [her] claim." (cleaned up)). In other words, Haymon realized sometime in 2014 that her federal constitutional or statutory rights had been violated, so she had two years—until 2016—to bring her Section 1983 claims. Ultimately, because Haymon did not file this lawsuit until

---

[6] Because the defense could raise the statute of limitations argument again at summary judgment, it is appropriate for the Court to raise this issue on its own (that is, the proper calculation for accrual), before the parties waste significant resources in discovery on claims that are clearly time-barred.

February 2018, her Section 1983 claims for race, sex, age, and disability discrimination must be dismissed. This dismissal is with prejudice because it is not possible to cure the statute-of-limitations deficiency. (As discussed later in the Opinion, given that Haymon fails to plausibly allege *any* claim for religious discrimination, her Section 1983 claim is dismissed as to that theory as well).

## B. Claims Against the Individual Defendants

Before getting to the substance of Haymon's claims, there is one more threshold issue to address. As the Defendants correctly point out, Defs.' Br. at 8, neither Title VII, the ADA, nor the ADEA permit individual-person liability (outside the context of sole proprietors). *See, e.g.*, *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (Title VII); *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) (ADA); *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 n.2 (7th Cir. 2001) (ADEA). Instead, these anti-discrimination laws allow plaintiffs to sue only the employer as an entity. Defs.' Br. at 8. (And the same goes for claims under the Rehabilitation Act. *See, e.g.*, *Stanek*, 783 F.3d at 644.) For this reason, the Title VII, ADA, ADEA, and Rehabilitation Act discrimination claims against Olsen, LaCour, Salgado, Perez, Meyer, and Wynne are

dismissed with prejudice.[7] Thus, none of Haymon's claims against the individual defendants survive.

## C. Religious-Discrimination

### 1. Title VII (Religious Discrimination)

Having dealt with those threshold issues, next up is Haymon's religious-discrimination claim. The Defendants correctly argue that this claim is barred under Title VII because it goes well beyond the scope of Haymon's EEOC charge. Defs.' Br. at 6. Although it is true that "a Title VII plaintiff need not include in her charge every fact that, individually or in combination, forms the basis" of her complaint, Haymon's religious discrimination claim still has to be "reasonably related to" and "growing out of" the allegations in the charge. *Huri*, 804 F.3d at 831 (cleaned up).

Here, there is not a single mention of religious discrimination in Haymon's EEOC charge. *See* Pl.'s EEOC Charge at 1-6. Instead, the charge complains only of discrimination based on disability, age, and retaliation (and mentions previous complaints of disability, age, sex, and race discrimination filed internally with Metra). *See id.* So Haymon's religious-discrimination claim cannot possibly be "like or reasonably related" to the allegations in her EEOC charge. Because the EEOC charge failed to give the Defendants even minimal notice of an accusation of religious

---

[7]In her response brief, Haymon argues that she is actually bringing defamation claims against the individual defendants. Pl.'s Resp. Br. at 16-17. But a state-law defamation claim is completely new from the Amended Complaint, and indeed far too new to spring on the Defendants at this point. *See* discussion *infra* Part III(C)(2); *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). So Haymon may not proceed on a claim for defamation against the individual defendants (whether now or in any future amended complaint in this case).

discrimination, the Title VII religious-discrimination claim must be dismissed with prejudice. *See Huri*, 804 F.3d at 831 ("The primary purpose of the EEOC charge requirement is twofold: it gives the EEOC and the employer a chance to settle the dispute, and it gives the employer notice of the employee's grievances.").

## 2. Section 1983 (Religious Discrimination)

In addition, even though the Section 1983 religious-discrimination claim is not time-barred—at the pleading stage at least—Haymon still has to adequately *allege* religious discrimination to survive dismissal. (Although it is not clear whether Haymon is even bringing such a claim under Section 1983, the defense assumes that she does and it seems like she probably is, so the Court will address it). Generally, plaintiffs can bring religious-discrimination claims under various theories, including hostile work environment, failure to accommodate, and intentional discrimination. Here, Haymon has failed to allege enough facts to support a plausible religious discrimination claim under *any* theory.

For one, the only factual allegation related to religion is in Haymon's *response brief*, not in the Amended Complaint. Specifically, she alleges that Art Olsen told another employee that he was "going to help [Haymon] stay home so she can do her church work[,]" after which he would discipline her for staying home so she would eventually be "out of work here." Pl.'s Resp. Br. at 12. But even though Haymon may elaborate on her complaint when opposing dismissal—as well as submit additional materials to support her allegations—that "flexibility is not without limitations." *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). The Court

may only consider additional facts if they are consistent with the operative complaint. *Id.*

Here, aside from checking the box for religious discrimination on the *pro se* form portion of the Amended Complaint, Haymon makes *zero* allegations related to religion—not even in the single-spaced, 5-page long narrative section. This is especially problematic considering that the Defendants challenged the lack of factual allegations on religion in their *first* motion to dismiss, R. 30, after which Haymon amended her initial complaint—and yet she still failed to cure this deficiency. Under these circumstances, and even holding Haymon to a less-stringent pleading standard, it would be *impermissibly* flexible—and rather unfair to the defense—for the Court to consider the alleged "church work" comment. If the Court did so, then by that logic any plaintiff could simply file a bare, bulleted list of legal claims for a complaint, and then survive dismissal by *only* alleging facts in response to a Rule 12(b)(6) motion. But we know from *Twombly*, *Iqbal*, and their progeny that this cannot be the case— instead, a complaint must give defendants fair notice of the plaintiff's claim and the grounds upon which it rests. Because Haymon did not do so here, the "church work" allegation in her response brief cannot be considered, and the Section 1983 religious-discrimination claim fails on that basis.

It is worth noting, though, that even if the Court *were* to consider Olsen's alleged comment, it would still not be enough to support an inference of religious discrimination under any theory. To start, Haymon does not allege that the "church work" comment was somehow related to a request for a reasonable religious

accommodation that Olsen (or another Defendant) then denied. And although the form portion of the Amended Complaint does contain an allegation that "[t]he defendant … failed to reasonable accommodate the plaintiff's religion," Am. Compl. at 4, such a bare and conclusory assertion is not enough to give the Defendants "sufficient notice to enable [them] to begin to investigate and prepare a defense[,]" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008). So Haymon fails to state a plausible failure-to-accommodate claim.

The same goes for a theory of intentional religious discrimination. It is well-established that "[t]he central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. General Motors Corp.*, 433 F.3d 537, 540 (7th Cir. 2005) (cleaned up). *Cf. Friedel v. City of Madison*, 832 F.2d 965, 971 (7th Cir. 1987) ("When the plaintiff alleges intentional discrimination … it is clear that the same standards in general govern liability under sections 1981, 1983, and Title VII."). So on a claim for deliberate discrimination, Haymon must adequately allege that Metra subjected her to an adverse employment action *on the basis of her religion. See, e.g.*, *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013). But there is nothing to suggest that Olsen actually acted on his words to send Haymon home to do her "church work" and get her fired. And because Haymon fails to root Olsen's comment in any time frame, there is nothing linking it to any of the suspensions or disqualifications that occurred in 2015 and 2016 (if they could even qualify as

"adverse employment actions"). So Haymon also fails to state a claim for intentional religious discrimination claim.

Similarly, again even holding Haymon to a less-stringent pleading standard, the "church work" comment is not enough to support an inference of a religiously hostile work environment. To survive dismissal on such a claim, Haymon must allege that (1) she was subject to unwelcome harassment; (2) the harassment was based on her religion; (3) the harassment was so severe or pervasive as to alter the conditions of her employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *See Huri*, 804 F.3d at 833-34. It is true that, generally speaking, "it is premature at the pleadings stage to conclude just how abusive [a] work environment was[,]" *id.* at 834, Haymon did have to plead *some* facts that could plausibly be severe or abusive. But the "church work" allegation, standing totally alone, is not close to the requisite level of severe or pervasive harassment. *See Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) ("[O]ffhand comments[] and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." (cleaned up)). And while it is true that Haymon alleges other facts that could arguably rise to that level of severity—such as Boone's threats—there is nothing to suggest that the misconduct was based on

Haymon's *religion*. So Haymon cannot proceed on a religiously hostile work environment claim either.

For all these reasons, Haymon's religious-discrimination claim must be dismissed in its entirety and with prejudice.

### D. Disability Discrimination

Haymon also brings claims for disability discrimination under the ADA (or the Rehabilitation Act, or both)—although once again, it is not entirely clear what *type* of discriminatory conduct she is alleging. In any case, by alleging she was disciplined on the basis of her disability, Haymon has successfully (although just barely) stated a claim for intentional discrimination.

As a preliminary matter, the Amended Complaint sets forth more than just a legal conclusion of disability discrimination. Specifically, Haymon identifies herself an insulin-dependent Type II diabetic, alleges that the individual defendants laughed about her disability, and requests relief in the form of reasonable accommodation for the disability. Am. Compl. at 5, 7. So even though Haymon's intentional disability discrimination claim survives largely on the basis of allegations outside the Amended Complaint, as discussed in more detail below, those allegations are properly within the scope of the pleadings.

To state a claim for intentional disability discrimination, a plaintiff must adequately allege that she was (1) disabled within the meaning of the ADA (or the Rehabilitation Act); (2) qualified to perform the essential functions of her job; and (3) suffered an *adverse em*ployment action because of her disability. *See Bunn v. Khoury*

*Enter., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014); *see also Washington v. Ind. High Sch.*

*Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (explaining that, generally,

the standards applicable to the ADA are also applicable to the Rehabilitation Act).

Here, Haymon easily satisfies the first two elements. For one, contrary to the

defense's argument, Defs.' Br. at 7, diabetes *can* constitute a disability under both

the ADA and the Rehabilitation Act. *See, e.g.*, *Cloutier v. GoJet Airlines, LLC*, 311 F.

Supp. 3d 928, 936-37 (N.D. Ill. 2018) (diabetes can constitute a "disability" because,

under the ADA, disabilities include impairments that substantially limit the

operation of major bodily functions, such as the endocrine system). Second, the

Amended Complaint contains multiple allegations to support the inference that

Haymon was qualified to perform the essential functions of her job.[8] *See, e.g.*, Am.

Compl. at 7-8 (alleging that she knew the Chief Clerk position because she had done

it before); *id.* at 8 (describing herself as a "seasoned experienced clerk"); *id.*

(explaining that she "functioned effectively" in all the Mechanical Department

positions she held); *id.* at 10 (telling Perez, Meyer, and Carpenter that she felt

comfortable doing the General Clerk work by herself, after they asked her if she knew

---

[8]The Defendants' only argument as to Haymon's qualifications appears in their reply brief. *See* R. 62, Defs.' Reply Br. at 5. According to the Defendants, to the extent that Haymon's three strokes constitute her "claimed disability," then her "admission" that the strokes have prevented her from coming to work regularly "establishes that she cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Id.* at 5-6. But this argument is forfeited, because the Defendants raised it for the first time on reply even though the Amended Complaint contains essentially the same allegations about Haymon's strokes as her response brief. *See, e.g.*, *Carroll v. Lynch*, 698 F.3d 561, 564 n.2 (7th Cir. 2012). And in any event, the Defendants' argument is meritless. As previously discussed, it is readily apparent from the Amended Complaint (and the EEOC charge, for that matter) that Haymon's claimed disability is Type II diabetes. So the fact that Haymon has been off work since the last stroke in October 2016 has no bearing on whether she was qualified for her job at the time of the alleged misconduct.

the functions of the position). So at this stage, and given Haymon's *pro se* status, the allegations are enough to plausibly suggest that Haymon was disabled and that she was qualified to perform her job.

That said, the third element presents a bigger hurdle. "Generally, an adverse employment action falls into one of three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Tarpley v. City Colleges of Chi.*, 752 Fed. App'x 336, 346-47 (7th Cir. 2018) (non-precedential disposition) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011)). So to qualify as "adverse," an employment action requires something more than a mere inconvenience or a change in job responsibilities. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011).

Here, Haymon alleges that she was suspended for three days for missing work in December 2015, even though she was out on an approved medical leave. *See, e.g.*, Pl.'s Resp. Br. at 9; Pl.'s Sur-reply Br. at 10; Pl.'s Sur-reply Exhs. No. 1 at 96. As a matter of law, a three-day suspension plausibly qualifies as an adverse employment action. *Cf. Ellis*, 650 F.3d at 650 (although there was "no question that the [3-day]

suspension could qualify as an adverse employment action[,]" the plaintiffs failed to show a discriminatory motive on summary judgment).

Of course, to survive dismissal, Haymon must also plausibly allege that she was suspended *because* of her disability. On this point, Haymon has submitted documents saying that Metra approved her for *intermittent* leave from May 2015 to May 2016—which would cover the missed workdays in December 2015. Pl.'s Sur-reply Exhs. No. 1 at 135. Haymon appears to have requested an entire month off from work, *id.* at 26, but the conditions of the intermittent leave do not seem to allow such a long absence, *id.* at 135. Even so, Haymon alleges that she should not have been disciplined because the leave was "approved by the Metra Medical Department"— specifically, by a clerk named Katrina Wilbanks—and "granted by Human Resources[.]" Pl.'s Sur-reply Br. at 8, 10. Because Haymon is entitled to all reasonable inferences at this stage, the Court must assume that Metra *did* approve the medical leave. So even though the conditions of the intermittent leave seem to disallow an entire month of leave, the Court accepts as true that human resources made an exception or approved the time off under some other mechanism, and yet Haymon's supervisors suspended her anyway.

What's more, Haymon also alleges that in January 2016, Art Olsen—the Director of the Mechanical Department at the time, and the person who sent her the disciplinary charges—told her she was abusing her medical leave and also said she was "blind as a bat" (presumably a reference to diabetes-related vision impairment)— both times in front of other employees. Pl.'s Resp. Br. at 9, 13; Pl.'s Sur-reply Br. at

10. Although this is a close call, it is plausible that these comments were an expression of Olsen's discriminatory animus towards Haymon's disability. And given that Olsen made these comments in the *same* month he disciplined her for taking an *approved* medical leave, Haymon has also adequately alleged a causal connection between the Olsen's comments and the three-day suspension. *See* Pl.'s Sur-reply Exhs. at 96. Of course, it is entirely possible that Haymon will not be able to produce enough evidence to survive summary judgment on this issue. But at the pleading stage, Haymon's allegations are enough to state a plausible claim against Metra for intentional discrimination on account of disability.

In contrast, the facts here do not support a claim of disability discrimination on any other theory. Haymon's plausible allegations that Olsen discriminated against her on the basis of her disability *after* her medical leave was approved is more appropriately characterized as a claim for intentional discrimination. So to the extent that Haymon intended to bring a failure-to-accommodate claim, she would have had to allege enough other facts to support an inference that Metra failed to reasonably accommodate her disability. *See Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013). But Haymon has not done so. Had she alleged, for instance, that Metra *denied* her request for a month-long medical leave in December 2015, even though the request was reasonable under Metra's policies, that might have constituted a

failure-to-accommodate claim. At this point though, Haymon's reasonable accommodation claim must fail.

The same holds true for a hostile-environment claim on the basis of Haymon's diabetes. *See* Pl.'s EEOC Charge at 2 (general allegation of harassment due to disability). For one, Olsen's January 2016 comments are the *only* allegations that could possibly have anything to do with Haymon's disability. And just like Olsen's remark about Haymon's "church work," there is nothing to indicate that these comments *on their own* constituted such serious harassment that they altered the conditions of Haymon's employment. *See Huri*, F.3d at 834; *Dandy*, 388 F.3d at 271. Nor does Haymon allege that anyone else made disparaging comments about her diabetes (let alone that they were sufficiently severe or pervasive). So Haymon also cannot proceed on a hostile work environment claim as to disability.

But given that she has adequately alleged *intentional* disability discrimination, Haymon's failure-to-accommodate and hostile work environment claims on account of disability are dismissed *without* prejudice. In other words, if Haymon truly believes that she has meritorious claims under these theories (and to be clear, on the basis of her diabetic condition only), then she may re-allege them in a second amended complaint by April 29, 2020.

### E. Age, Sex, and Color

Next up is the Defendants' argument that Haymon failed to adequately allege a claim for intentional discrimination on the basis of her sex or color under Title VII, or on the basis of her age under the ADEA. Defs.' Br. at 8. According to the Defendants,

there are no facts to support an inference that Metra took any adverse employment action against Haymon on account of any of these characteristics. *Id.* The Court agrees. In contrast to Haymon's plausible allegation that she was suspended on the basis of her disability, there is nothing to indicate that she suffered a similarly adverse action due to her sex, color, or age.

For instance, Haymon complains that she was unfairly disqualified as General Clerk in the Engineering Department in August 2016, alleging that no other employee had ever been forced to take a test to be awarded a similar position. To be sure, there *are* some facts indicating that she was disqualified on the basis of her age. According to Haymon, in August 2016, Meyer—the Director of the Engineering Department at the time—told her that the department needed "young blood" to maintain the flow of work; and that same month, both Perez and Wynn told her that she was "too old" for the position. Pl.'s Resp. Br. at 11-12. That said, although Haymon might have been disqualified due to her age, she has not adequately alleged that the disqualification constitutes an *adverse* employment action. In fact, Haymon actually pled herself out of court on this point: she alleges that when she was disqualified, she "bumped back into the mechanical department as General Clerk[.]" Am. Compl. at 10. But "a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams v. Bristol-Myers Squibb*, 85 F.3d 270, 274 (7th Cir. 1996). And "[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Id.* In Haymon's case, the only plausible inference that can be

drawn from her allegations is that the 2016 disqualification resulted in a purely lateral transfer to essentially the same position but in a different department.[9]

Aside from the 2016 disqualification, the only other *potentially* actionable employment action that Haymon alleges (within the statute of limitations) is the 10-day suspension she received in February 2016. *See* Am. Compl. at 9; Pl.'s Resp. Br. at 10. According to the disciplinary records Haymon has submitted, she was suspended for violating Metra's Internet Acceptable Use Policy by downloading and printing non-Metra documents using her work computer. Pl.'s Sur-reply Exhs. No. 1 at 104-105. Of course, as explained above, a suspension can certainly constitute an "adverse" employment action. And here, Haymon contends that the suspension was unfair because the documents were for a class that Metra had agreed to pay for, and because other employees were not disciplined for committing even more serious infractions. Am. Compl. at 9. But even accepting Haymon's allegations as true, there is still nothing (in *any* of her various submissions) to connect the dots between the suspension and her sex, age, or skin color. (Haymon also argues that she was suspended in retaliation for engaging in protected activity; this claim will be addressed later in the Opinion.)

And to the extent that Haymon is bringing hostile work environment claims on the basis of her age, sex, or color, those claims must fail as well—largely because

---

[9]Haymon also complains that she was disqualified as Chief Clerk in the Mechanical Department (and forced to revert back to General ClerkGeneral Clerk) in March 2015. But even if this disqualification could constitute an adverse employment action, Haymon is still barred from bringing any Title VII, ADA, or ADEA claims for conduct occurring before November 7, 2015.

Haymon does not plausibly allege the requisite level of severity or pervasiveness. Occasional offensive comments about a certain age, sex, or color do not create an actionable hostile work environment. *See Alamo v. Bliss*, 864 F.3d 541, 549-50 (7th Cir. 2017). And although the comments about Haymon's age were no doubt prejudiced and unpleasant, there is nothing to suggest that they substantially interfered with her job performance or made her work environment unbearable. *See Tarpley*, 752 Fed. App'x at 347. Similarly, Haymon's only factual allegations as to color (and race, as discussed in the next section) is Salgado describing her as "nappy head pumpkin," and some of the Defendants laughing about her skin color, Am. Compl. at 5, 11; and as to sex, that Olsen called her "the old girl" and at one point said that "Metra will never hire a female Superintendent[,]" Pl.'s Resp. Br. at 13. As offensive as those insults are, Haymon does not suggest that these types of comments were made so frequently that her work environment was "pervaded by discrimination" to the point of becoming abusive. *See Alamo*, 864 F.3d at 549-50. Nor are the comments severe enough on their own to create a hostile work environment.

For all these reasons, Haymon's discrimination claims on the basis of her age under the ADEA, and her sex or color under Title VII, must be dismissed. This dismissal is also with prejudice because the Defendants made the same arguments

in their first motion to dismiss, yet the Amended Complaint still fails to adequately reallege these claims.

## F. Race Discrimination

Turning to Haymon's allegations on race discrimination, the Defendants' argument here essentially follows the same pattern as on the other claims—that Haymon failed to adequately plead either an adverse employment action on the basis of her race (for intentional discrimination), or severe or pervasive racial harassment (for hostile work environment). Defs.' Br. at 10-12. The Court will discuss each of these arguments in turn.

Starting with intentional discrimination, Haymon need only plausibly "aver that the employer instituted a (specified) adverse employment action against [her] on the basis of [her race]." *Tamayo*, 826 F.3d at 1084. But once again, the allegations fall short of meeting even this forgiving standard. First—to repeat—the 2016 disqualification resulted in a purely lateral transfer to another department, so it does not qualify as an adverse employment action as a matter of law and cannot serve as the basis of Haymon's race discrimination claim. And although Haymon's disqualification from the Chief Clerk position in March 2015 appears to have resulted in a demotion—given that Haymon had to revert to the position of "General Clerk"— and so could potentially amount to an adverse employment action, it is time-barred under both Title VII and Section 1983. As explained in more detail above, Haymon's Title VII claims are limited to misconduct that happened after November 7, 2015. And with regard to Section 1983 (presumably based on the Equal Protection Clause),

given that Haymon alleges she was the only African-American woman in the Mechanical Department in 2015 and 2016, she reasonably should have known *at the time* of the 2015 disqualification that it was motivated by her race. But Haymon did not file this suit until February 1, 2018, so any Section 1983 race-discrimination claim premised on the 2015 disqualification falls outside the two-year statute of limitations.

Meanwhile, to the extent Haymon argues that the 2016 suspensions amount to adverse employment actions, the failure to adequately allege the *second* part of that requirement—that the suspensions were motivated by her race—once again defeats Haymon's claim. As previously mentioned, a plaintiff may survive dismissal by simply alleging that a particular adverse employment action was taken on the basis of their race. *See Tamayo*, 826 F.3d at 1084. But here, none of the allegations relating to the three-day or the 10-day suspensions—in either the Amended Complaint, Haymon's supporting briefs, or Haymon's supporting exhibits—mention any *facts* remotely related to race. *See* Am. Compl. at 9; Pl.'s Resp. Br. at 9-10; Pl.'s Mot. for Sur-reply at 2-3. So for instance, although Haymon's discussion of the 10-day suspension falls under the header of "Plaintiff Race Discrimination Claim" in her sur-reply, the bare assertion in the title is not sufficient on its own, and the lack of any "factual enhancement" as to race within the discussion itself "stops short of the line between *possibility* and *plausibility* of entitlement to relief." *See Tamayo*, 826 at 1082 (emphasis added) (cleaned up).

Moving on to Haymon's claim for racially hostile work environment (assuming she intended to bring one), the only relevant allegations are (1) that some of the

individual Defendants laughed about her skin color; and (2) Salgado's description of Haymon's Afrocentric hair as a "nappy head." First, it is worth noting (as to the latter allegation) that there is no question that racial discrimination claims by Black women on the basis of their hair texture or natural hairstyles are viable, and have been for a long time. *See, e.g.*, *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 168 (7th Cir. 1976) (plaintiff's EEOC charges of discrimination based on her Afro hairstyle were enough to support other allegations of racial discrimination in her Title VII complaint). But even looking at Haymon's allegations on race together and construing them liberally, the Court still cannot draw a plausible inference of a racially hostile work environment. Mainly, although the laughter and "nappy head" comment are certainly offensive, there is nothing to suggest that they were anything more than isolated and unpleasant incidents (as opposed to such pervasive or abusive behavior that the very conditions of Haymon's employment were altered). *Cf. Cole*, 838 F.3d at 897.

Ultimately, the fact that Haymon was the only Black woman in the Mechanical Department cannot, in and of itself, raise a plausible inference of racial discrimination or harassment. *See, e.g.*, *Cole v. Bd. of Trs. of Northern Ill. Univ.*, 838 F.3d 888, 897 (7th Cir. 2016) (explaining, on summary judgment, that just because certain events happened to a plaintiff who was also the sole African-American employee, it does not mean they happened *because* of his race or because of racial animus). Even holding Haymon to a less-stringent pleading standard, she still has to allege *some* facts to reasonably connect the misconduct with her race. But aside from

the laughter and the "nappy head" comment—which were neither severe or pervasive, nor linked to an adverse employment action—all Haymon alleges is her identity. This is not enough, so the race discrimination claims must fail. (And once again, because the defense raised essentially the same challenges in the first motion to dismiss, Haymon's race discrimination claims are dismissed with prejudice.)

### G. Retaliation

Finally, Haymon alleges that Metra retaliated against her for complaining about the mistreatment that she experienced. *See, e.g.*, Am. Compl. at 4, 8. To successfully plead a retaliation claim, Haymon must plausibly allege that "she engaged in statutorily protected activity and was subjected to an adverse employment action as a result." *Carlson v. CXS Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (cleaned up). Haymon has done so here.

Specifically, Haymon has plausibly alleged that Meyer, the Engineering Department Director, disqualified her from the General Clerk position in August 2016 in retaliation against her complaints. First, Haymon alleges that beginning in 2014, she filed several internal complaints with Metra's Equal Employment Opportunity department on unlawful discrimination based on her race, sex, age, and disability. *See, e.g.*, Pl.'s EEOC Charge at 5; Pl.'s Sur-reply Exhs. No. 1 at 129-30; Pl.'s Resp. Br. at 7, 19. Then, on August 23, 2016, after moving from the Mechanical to the Engineering Department, Haymon "requested to see the Director to complain about [her] treatment by Meyer." *Id.* Indeed, as discussed above, Haymon has alleged that both Meyer and Perez disparaged her age in August 2016. *See* Pl.'s Resp. Br. at

11-12. So giving Haymon the benefit of all reasonable inferences, these allegations—when read together—suggest that Haymon engaged in protected activity on August 23 by complaining to Meyer about unlawful discrimination. *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (protected employee conduct includes "opposition to employment discrimination, and … submission of or support for a complaint that alleges employment discrimination[.]").

That said, Haymon still has to plausibly allege that she suffered an adverse employment action *because of* the protected activity. But unlike the standard used in discrimination claims, an adverse employment action for purposes of a *retaliation* claim just has to dissuade a reasonable employee from "engaging in the protected activity." *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018). Here, Haymon alleges that the day after her complaints, on August 24, Meyer disqualified her from the General Clerk position, forcing her to bump back into the Mechanical Department. *See* Pl.'s EEOC Charge at 5; Am. Compl. at 10. Although the disqualification might not have significantly altered Haymon's job responsibilities or pay, it was certainly the type of action that would discourage a reasonable employee from complaining about unlawful discrimination in the future. Indeed, Haymon specifically bumped into the Engineering Department in order to escape the discrimination at Mechanical, so it is easy to infer that depriving her from her preferred job constituted an "adverse" action. Not only that, but Meyer also told Haymon that he had never before

disqualified *anyone* from a position. Pl.'s Sur-reply Exhs. No. 2 at 168. So all in all, Haymon has alleged enough facts to support an inference of retaliatory motive.

To be clear, the 2016 disqualification is the *only* plausible instance of retaliation in this case. Although Haymon also claims that her three-day and 10-day suspensions were retaliatory, there are no facts linking the suspensions to any protected activity on Haymon's part. Under Title VII, the ADA, and the ADEA, a "protected activity" for retaliation purposes means either opposing unlawful discrimination or making some kind of complaint of discrimination. *See, e.g., Cole*, 838 F.3d at 901 (Title VII); *Casna v. City of Loves Park*, 574 F.3d 420, 426 (7th Cir. 2009) (ADA); *Horwitz*, 260 F.3d at 612 (ADEA). But here, there is nothing to suggest that Haymon's suspensions were motivated by any *complaints* of discrimination she had made. For example, Haymon did not allege that she was suspended for three days for *complaining* that she was denied medical leave or some other reasonable accommodation for her diabetes condition. And in fact there are not even any discernible allegations of such a complaint being made reasonably close in time to the suspensions, so that the Court could plausibly infer a retaliatory motive. So to the extent that Haymon intended to bring a claim for retaliation on the basis of her medical leave, there are no facts to support an inference that she was suspended for that reason. Plus, although Haymon also contends that she was disqualified from the Chief Clerk position in March 2015 in retaliation for her complaints in *2014*, she is time-barred from pursuing that  claim under Section 1983, Title VII, the ADA, the

Rehabilitation Act, and the ADEA (as discussed above). *See, e.g.*, *supra* Part III(A), (F).

In sum, Haymon's retaliation claim survives only on the basis of the 2016 disqualification (and to repeat, only against Metra); otherwise, it is dismissed with prejudice. *See* Defs.' 1st Mot. Dismiss at 9-10 (arguing that Haymon failed to state a claim for retaliation).

## H. Punitive Damages

Haymon also asserts that she is entitled to punitive damages. *See, e.g.*, Am. Compl. at 6; Pl.'s Resp. Br. at 17-18. Although it is rather early to talk of damages when we are only at the pleading stage, it is worth clarifying that a plaintiff cannot recover punitive damages against a governmental agency (under either Section 1983, Title VII, the ADA, the Rehabilitation Act, or the ADEA). *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 189 (2002); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270-71 (1981); *Baker v. Runyon*, 114 F.3d 668, 671 (7th Cir. 1997); *Espinueva v. Garrett*, 895 F.2d 1164, 1165 (7th Cir. 1990);. Given that none of Haymon's claims against the individual Defendants survive, this means that Haymon will not be able to recover any punitive damages (if the suit gets to that point).

## I. Railway Labor Act

Lastly, the Defendants argue that Haymon's claims implicating the collective bargaining agreement (between her Union and Metra) are preempted by the Railway Labor Act, Defs.' Br. at 14, "which requires that any claim of a railroad or airline employee that is 'grounded' in a collective bargaining agreement be decided by an

arbitrator[,]" *Carlson*, 758 F.3d at 825. But Haymon does not appear to be bringing any claims that are "grounded in" or "inextricably tied to the interpretation of" a collective bargaining agreement, *see* Defs.' Br. at 14, so there is no need to resolve this question at this point.

## IV. Conclusion

For the reasons explained above, the only surviving claims are (1) intentional discrimination on the basis of Haymon's disability (diabetes); and (2) retaliation (based on the 2016 disqualification) for engaging in protected activity (complaining about religion, race, age, sex, or disability discrimination)—and once again, both of these claims survive only against Metra. In addition, Haymon may reallege any other disability discrimination claim she might have (and *only* disability discrimination) in a second amended complaint by April 29, 2020. Otherwise, Haymon's discrimination claims on the basis of her religion, age, sex, and race are dismissed in their entirety, and with prejudice (meaning they are permanently out of the case); *all* of Haymon's claims are dismissed against the individual Defendants with prejudice; and her retaliation claim is dismissed with prejudice (except as to the 2016 disqualification).

In light of Second Amended General Order 20-0012, the status hearing of April 7, 2020 is reset to May 27, 2020, at 9:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2020